23-13628, Donald and Margarita Whidden v. Federal Insurance Company Mr. Weber, whenever you're ready. May it please the Court. My name is Tim Weber. I represent the appellants in this matter. We start out with the familiar Celotex v. Catret that summary judgment is mandated against a party that has the burden of proof on an issue and fails to come forward with evidence. Before you get into the merits, and I'll give you a little bit of extra time because you're going to address these issues first, Federal says that the only issue that is on appeal is the District Court's denial of your motion to alter and amend because your first motion to alter and amend, which was timely filed, was denied. By the time you filed the second motion to alter and amend, the time for filing it had run, and therefore that second motion didn't toll the time for appeal. By the time you took the notice of appeal many months later, too late to appeal the initial judgment precipitated by the summary judgment order, all you've got left is the order denying your motion to alter and amend. Can you address that issue first? Sure. That gets to Docket 80, which was our motion for relief from the order denying the Rule 59e motion. We filed timely a Rule 59e motion. The Court says you forgot to put a certification of consultation with opposing counsel in there. We filed a Rule 60 motion seeking two different species of relief. Number one, vacate that order on our first Rule 59e motion, and second, allow us to amend our original 59e motion. The Court granted our motion, as requested, both relief. The order denying the first Rule 59e motion, we were granted relief from that order, and then the Court went on and allowed us to amend our original motion to put the certification. Precisely . . . Your position is because of the way the district court raised its order on your motion for relief from that order of denial, your amendment related back to the first motion to alter and amend. Yes. We addressed this in our reply brief because they raised this in their answer brief. Once relief is granted from the first order denying the Rule 59e motion, that restored the proceedings to the position that they were in just prior to entry of that order, which was our Rule 59e motion was pending. Then, we cited this Court's cases that allow a timely filed Rule 59e motion to be amended at any time, and that amendment relates back to the filing of the original 59e motion. Okay. I understand the position. That was based on the relief specifically sought in our motion that says, grant us relief from the order and allow us to amend our motion. Mallory, can you give him back his original time, please? Thank you. We appreciate the time this morning. This case is about summary judgment and the burden of proof. Federal convinced the district court not only that it was the appellants that had the burden of proof and failed to come forward with evidence on structural damage, sinkhole activity, or some other covered cause of loss, but that their experts were even presumed to be correct. You do have the ultimate burden of proof in the case, right? Not at summary judgment. You've got to prove. You're the plaintiffs. You're moving forward on a claim for benefits on a sinkhole loss. If you got to a jury, you'd have the burden of proof. No, the district court summary judgment order finds that our burden was met. That's not my question. You have the traditional burden of proof in the case. I'm not asking about summary judgment burdens. You've got the burden of proof in the case. If you went to trial, who would have the burden of proving that federal should pay benefits on your sinkhole claim? Ultimately, us, but that burden is only to show that there was a loss that occurred during the policy period. Yes, but you've got the burden of coming forward and showing that that is true. Correct, and the court noted that we had presented evidence of that, that Ms. Whitten had discovered the damage and immediately reported it during the policy period. Once the insured comes forward and says, I have an all-risk policy, every risk is insured against, and I suffered damage during the policy period, the insured has 100% completely met their burden of proof in the case. That is in the Barbarin and Diaz cases that were recently decided. That's what the 2014 Mejia case says, the Munoz case, and importantly, the Salke case that we cite says there's an additional layer, whereas here, there is possible concurring causes of the loss. The insurance company has the burden of showing that no covered peril was a contributing cause to the loss. The concurring cause doctrine is an additional layer of proof the insurance company bears to show not only we think it was deleterious soils that caused the conditions there and the foundation settling, but that there were no other causes. When you take the concurring cause doctrine in Florida as articulated in Salke, look at the instructions in these cases. The Barbarin case, while this case was pending, says the burden of proof is on the insurance company to show all possible causes of the loss are uncovered. Why the focus by both parties on sinkhole loss if this is an all-risk policy? Why didn't you just say there was damage to the structure and to the story? We did. The Mejia case addresses the oddity in Florida that sinkhole loss is an endorsement, but it still doesn't change the all-risk character of the policy and the burden of excluding sinkhole loss still resides on federal. Our district court erred in saying the plaintiffs had the burden of establishing structural damage and sinkhole activity and then faulting us for failing to carry that out when, in fact, our cross-motion for summary judgment said federal never excluded structural damage because they didn't consider one of the criteria. Their expert came in and said, I only looked at the levelness of the entire slab, which is plus or minus three-quarter inches over the entire slab, and he specifically did not investigate localized unlevelness, which occurred in the dining room where the floor and the wall were separating and the cracking. He didn't consider the second tolerance under ACI 11790, which is the ten-foot straightedge on two high points. There's a gap of one-half inch between the floor and the straightedge. Now, the district court, by putting the burden on us, faulted our experts for not using the ten-foot straightedge method when, in fact, their expert didn't do it either and they're the ones with the burden of proof. If, in fact, federal has the burden of proof, as Mejia and Barbarin and Diaz clearly established they do, their expert failed to conduct one of the two evaluations under ACI 11790 that was necessary. What is the best opinion or conclusion reached by the experts on your side? On our side, our experts opine to both structural damage and sinkhole activity. Both of them. Expert Smith signs an affidavit. Did they go as far as to say there was causation or a nexus between the two, or just there was one and then there was another, and therefore, with the presumptions and burden, you assume in an all-risk policy that this was at least partially caused by sinkhole activity? Yes. They not only opine to the presence of sinkhole activity at the site and the existence of structural damage, but in relating that to the dining room area where the floor and the wall was separating and where they're cracking across the entire house foundation, yes, they related the presence of sinkhole activity at the site. And moreover, the federal's own expert says, I cannot eliminate sinkhole activity as a possible cause of this. This is my opinion. It was the deleterious soils. But he says, I can't eliminate another possible concurring cause. And that's their burden as a matter of law, to eliminate the possibility of a covered cause under the concurrent cause doctrine. And so we've set forth quite clearly here. They went out and only investigated. What's a concurrent cause? So concurrent cause is if your damages are caused. I know what in theory it is. What is it factually here? So sinkhole loss is the concurring cause. What's the other cause, he's asking you? Yes, so. Concurring causes, there are two. So sinkhole is one. What's the other? Improper compaction of the foundation, potentially organics or construction debris in the foundation. Which is the other cause? Not might be, other than maybe. Yeah. Which is the other cause shown in the evidence? Sinkhole activity is the other cause. And sinkhole activity would be covered. It was a prime cause, was it not? It doesn't actually matter whether it's a prime cause. As a matter of fact, wasn't that the first thing everybody was looking for, was sinkhole activity? Well, you would have thought so, but Federal's first expert goes out and doesn't look for that. At no point does Federal's expert ever do a sinkhole activity test. You have to do deep penetration borings. And so the testimony of Federal's expert is, I never was asked to do a sinkhole investigation on whether there's sinkhole activity. I cannot exclude sinkhole activity as a potential cause, contributing cause. And you have to look at Federal's own policy. Their own policy defines caused by as meaning any loss that is contributed to, made worse by, or in any way results from that peril. It's a very broad... It doesn't have a sole cause. It's not an anti-concurrent cause policy. It's a, hey, if it in any way contributes. And when their expert cannot exclude it as a possible contributing factor, there's coverage as a matter of law. Under the Selke case, which is right on point, in that case they instructed the jury, you have to prove that there is no possibly covered cause. And that's what they failed to do here. They failed to establish both elements of the structural damage to exclude. Is the insurer supposed to speculate what all the causes might be? Or is the policyholder supposed to do that? The instructions that juries are given is all possible causes. I understand that. What does, as a universe, could be a hurricane, could be anything. Who knows? Act of God, for example. Right. Well, all risks are covered except for the ones that are excluded. So they should at least try to investigate potential covered losses. And here, not only did they... What is the end line to investigate? Everything possibly that could cause the slab problem? They were brought out to a home where the soil under the house had settled, causing major cracking. It seems to me rather obvious, and I'm not an engineer, that sinkhole activity in the Tampa Bay area would be one of the things that I would want to exclude as a potential cause. They didn't do that in their initial evaluation. They came back after the insured said, well, did you look for sinkhole loss? They came back and they did a limited analysis. They got to step one and said, we conclude there's no structural damage, and therefore we don't have to look for the presence of sinkhole activity. So they admit at no time did they look for sinkhole activity or exclude sinkhole activity as a possible concurring cause. They hung their hat on their structural damage investigation, which only investigated the overall slab levelness and not localized unlevelness, which is the one half over ten feet criteria. Our experts identified it in their data and our experts' data. Their experts didn't exclude it. To the extent that the district court faulted our experts for not using a ten-foot straightedge, their expert never used a ten-foot straightedge. That ax falls on federal, not my clients, because the district court got the burden of proof wrong. Not only did she get the burden of proof wrong, the district court actually presumed their experts were correct when there are two Florida Supreme Court cases that specifically say that presumption has no application. What's the best language in the opinion that lets you believe that the district court favors and presumes federal's experts to be correct? She says right in her opinion, the 7073 presumption, she says the widens didn't presume their expert was correct. In fact, they're in here arguing they didn't do a good job. Their experts. Correct, federal's expert. You said the widens. Yes, so the district court faulted the widens for not presuming their expert to be correct. Federal's experts to be correct. Federal's experts for being correct, right. And that presumption, the court said in Warfel, Florida Supreme Court, in Johnson, I was counsel in that case, and they took conflict with Warfel in reversing Johnson, saying you just don't apply that presumption anywhere near a sinkhole case. You've gone over your time, but you've saved all of your time for rebuttal. Thank you. Thank you very much, Mr. Kammerer.  Good morning. May it please the court, my name is Laura Ferrant, and I'm here with my colleague Veronica Daniel, who represent the Apelli Federal Insurance Company. I want to make one thing very clear, because unfortunately these terms are being used interchangeably, repeatedly. When I just heard my colleague over here say, but they are not the same thing. Sinkhole activity and sinkhole loss. It is critical to understand that this policy only covers for sinkhole loss. It's an all-risk policy, so why does sinkhole... I've been confused about this ever since I started reading the briefs. If it's an all-risk policy, why does it matter whether or not a sinkhole activity caused a sinkhole loss? This is an all-risk policy, like you said. So the initial burden of proof, of course, rests with the policyholder, simply to show that there is a direct physical damage during the policy period. The burden then shifts to the insurer. That's the only issue the district court decided, right? No, that is incorrect. It said there was no structural damage, because it credited your experts. No, continuing to that, under the statute, to have a sinkhole loss, you need two components. The first and most important component is structural damage. Structural damage under the statute, which our policy quotes verbatim, gives a very specific definition of what is structural damage. And specifically in this case, it looked at ACI 11790, which is the only standard that should be evaluated for a ground floor, which is what we are looking at here. And in fact, the appellant's own experts agreed on that eventually. And the only expert that disagreed, surprisingly, has been dropped from this appeal, but that was the expert that they relied on on summary judgment that the district court found was mistaken in trying to apply both ACI 11790 and the Florida Building Code. So going back to that statute, a sinkhole loss is structural damage caused by sinkhole activity. If you don't have structural damage, you cannot have a sinkhole loss. That is the first and most important component of that. You just have to help educate me. Of course. If it's an all-risk policy, why does it have to be sinkhole? Because there is an exclusion in our policy for sinkhole, for any loss caused by sinkhole. Then there is a very limited endorsement that adds back only limited coverage if there is a sinkhole loss under the very specific definition in our policy, which again mirrors the Florida statute verbatim. Yes, go ahead. In layman's terms, and I know this is not a good thing to do, but in layman's terms, the policy takes sinkhole away and then gives part of sinkhole back? Correct. By virtue of having an exclusion for sinkhole, period, and then having a very limited endorsement that only adds back the coverage if you meet this very specific definition in order to get coverage for the sinkhole loss, you have to meet that very specific definition. Which, of course, mirrors the Florida statute's verbatim. In this case, our experts unequivocally showed that they did not meet the definition of structural damage under the statute. This is my first introduction to sinkhole cases in Florida, so I'm a neophyte. As I read, and I haven't gone into the record completely, but as I read the description in the three briefs about the expert testimony, I thought they had expert testimony which said that there was sinkhole loss because there was structural damage using this ACI code. There's the error, Your Honor. Their first engineer, Engineer Smith, who's been dropped from this appeal and was also dropped from their motion for relief to the district court, he did his calculations. That number added up to 1.3. And then he said, okay, 1.3 under the first prong of ACI 11790 does not exceed the acceptable level, which is 1.5, so meaning it's okay. But then what he did is he looked at the Florida Building Code, which is a completely different standard, and he said, well, under the Florida Building Code, that 1.3 number would in fact exceed so you have structural damage. However, the clear authority is that the Florida Building Code only applies to a second story, a third story, a fourth story, what's called an elevated floor. So he applied an improper table, an improper guideline for the ground floor in order to find the conclusion that he wanted. What about the other expert? Anderson, the other engineer, actually disagrees with Smith, and that's part of what the district court noted in the record. What did Anderson say in and of himself? What did his report say or her report say? Anderson does not test for structural damage at all. So the only person who's tested for structural damage on behalf of appellants was Engineer Smith. Anderson simply reviewed Smith's report, provided his own opinion, which actually disagrees with Smith as far as the Florida Building Code application, and then Anderson sent people from his office to go out and test for sinkhole activity. Notably, the people from his office that tested for sinkhole activity were not geologists, they were not licensed geologists, and the only test that was done was done at the very end of the house, 30 feet into the ground, but all the damage that's being claimed is at the beginning of the house, a good half a block away. So they were never able to tie the two things together, which was a key question you asked my opponent a few minutes ago. Were they able to tie the cracks that's seen in the beginning, in the entrance of the house, in the foyer, to the sinkhole activity, which is at the very end of the house? And notably, when they're asking a federal expert about sinkhole activity, the person they were asking is our structural engineer, Randy Howard. It wasn't his job to test for sinkhole activity. We hired another expert, a geologist, a professional geologist, Scott Hollingsworth, to test for that, but during the litigation, they didn't even depose him. He was made available the entire time. He was adequately disclosed in all disclosures. They never even deposed the guy that was supposed to test and was in charge for testing for sinkhole activity, yet they harpooned on asking the structural engineer why he hadn't done that. It wasn't his job. One of the witness' arguments is that the district court erred in, in effect, giving a presumption of correctness to your experts and that that violates cases like Werfel. Can you respond to that? Yes, I can, Your Honor. She did not. The only section where the district court talks about a presumption of correctness, which is 627-7073 of the FLARS statutes, is in the summary of the background facts section of her order. The reason she mentions it is because in pre-litigation proceedings, when a sinkhole loss is being adjusted, the insurer does have an obligation, once they receive the report from a professional engineer or professional geologist, in this case, we had both. We did more than the statute requires. The insured is supposed to presume that the accuracy of the data those experts gathered is true. The insured in this case didn't do that, but that only has to do with pre-suit investigation. That's part of the adjustment of the claim. And accordingly, that's why the district court only mentions it in the summary of the background section where she's talking about the claim history. And then, if you look at the actual order, her next paragraph talks about the litigation, and then she never talks about presumption of correctness again. And in fact, footnote 15 of her order shows very clearly that she's weighing all evidence from all experts in this case. She's looking at the actual data. She looks at all the numbers. And the numbers are the best evidence. They speak for themselves. And you can see from her order as well the pains that she goes to to analyze all this data. She's gone through all the charts in the Florida statutes. She's gone through the ACI 11790. She's read the experts' deposition transcripts. She's looked at their orders, excuse me, reports. She's looked at their measurements. So she's been very thorough in looking at all the data, all experts, giving no experts a particular weight. Is it fair to say that what your experts concluded with regard to structural damage was that there was a deviation, but that deviation fell within acceptable limits under the ACI code? Correct. Under ACI 11790, what's called deflection is simply movement in the floor. So under that statute, there's a certain amount of movement that's allowed. For starters, the house may not have been perfectly built. So you're assuming that the floor starts perfectly level, but what if it doesn't? So there allows for some deviation and imperfections in construction. And then it allows for some deviation just in natural settlement of the ground over many years, et cetera. So it's not until you reach that critical number of 1.5 inches, which is a deflection of movement in the ground of more than 1.5 inches, that the obligation is then triggered to look at, well, what's causing this movement? And that's where the obligation gets triggered to look for some collectivity and to start looking for other causes. It wouldn't say, in part, that what your experts did was examine that deflection or deviation at the edges, but not at the middle. That is incorrect. So our expert did a differential elevation survey, which looks at the entire floor, all the entire first floor, takes all the averages, all the measurements, calculates them against the table of ACI 11790, and based on all the averages, it doesn't exceed. And in fact, the most movement that was found in the dining room, which is one of the areas the Whittens have complained about, was 0.9, which, of course, needs to be taken into the averages overall, which is nowhere near 1.5, but even on its own, it's nowhere near 1.5. So they did look at the entire floor. They did look at all the elevations. And in fact, our experts also did another test where you get a straight edge, you lay it down, and you see if there's any gaps, any craters that exceed half an inch. None were found. The biggest crater that was found was a quarter of an inch, and that was near a wall, so not even close. Notably, appellants' experts didn't even do that test. Mr. Weber argues in part that your experts did not use the 10-foot straight edge, and the district court blamed the Whittens' experts for not doing that. There's no requirement to use a 10-foot straight edge. It's when the code was written... No, it's not that. It's that he says that the district court faulted his experts for not doing that, and your experts didn't do it either. No, I wouldn't say that she faulted it, Your Honor. She simply noted, I think what she meant to note was that they didn't even measure for it. So in order to measure for a gap, a crater, you have to put a straight edge 10 feet, 8 feet. The law is written as a 10-foot straight edge, but it doesn't have to be 10 feet. You lay a straight edge, and you look at the gap. Did your experts use a 10-foot? It wasn't 10 feet. I think he used 8 feet, but at the end of the day, the idea is that you use a straight edge to measure a gap, and if the gap, which is like a little crater in the floor, exceeds more than half an inch . . . But if the statute calls for 10, and your expert used 8, and you're faulting them for not coming in within the statutorily adopted ACI code, why isn't the fair thing to do to hold your experts to the statutory requirements, too? And I misspoke. What I meant to say is you have to use a straight edge, and the length that you're measuring is over 10 feet. So for sake of convenience, some people use a 10-foot straight edge, while you're measuring is the levelness between two high points over 10 feet. There's no specific requirement to use a 10-foot straight edge anywhere. It's just . . . But if you don't use a 10-foot straight edge, then you're left to the vagaries of shifting the 8-foot a little bit to then cover the whole 10 feet. Of course, Your Honor. But notably, we did measure, and we found only a quarter of an inch, so .25. Their expert never even measured. So no evidence was even presented at all to dispute the findings of our expert in that particular crater. And again, the bigger issue is that when you look at their actual data, the actual data their experts gathered, it supports our position. It supports that there was no structural damage under the Florida statutes in this case. And on top of that, our experts even went further to show that what was causing the cracks in the home that were being reported was deleterious soil materials, improperly buried construction debris, rotten organics. So basically what had happened was the house that stood on this property in the 60s was torn down, buried underneath, and the new house in 1988 was built on top. So our experts proved that the actual cause of the cracks that were being seen, which didn't rise to the level of structural damage, was not sinkhole activity, but it was something else. And that something else happens to also be excluded under our policy. And not only did a pellant expert agree that this stuff was buried in the ground, they haven't presented any evidence to dispute that. And this leads me back to that point. Sinkhole activity, which my colleague has been going on about quite a bit, is not a covered cause of loss under this policy. Sinkhole activity is a secondary element of the analysis of what is a sinkhole loss. Sinkhole loss is covered, but sinkhole loss requires structural damage caused by sinkhole activity. So sinkhole activity in and of itself is not a covered loss anywhere in this policy. So if it's not a covered cause of loss, how could it be a concurrent cause of loss? To Your Honor's excellent point earlier, in order to have concurrent causation, you need to have a covered cause of loss and an uncovered cause of loss. Here, all of the causes of loss are uncovered. They're all excluded. So where's your covered cause of loss to even trigger concurrent causation? It's a red herring. Okay, Ms. Friend, thank you very much. Thank you. Okay, Mr. Weber. With all due respect, I want to point to what the record shows. J.S. Held, Mr. Howard, was the chief engineer. He comes out, he does a report, and he says, I measured overall floor levelness at 1.1. That doesn't meet the 1.5, and that's it. He does not do the ACI 11790 Part 2, which is the half-inch gap over the 10-foot straight edge. It's not in his report. Tell me, on your side of the case, what expert provided the evidence that causes a genuine dispute of fact about whether or not there was structural damage? Forget the causation by sinkhole activity.  Just structural damage. Who was that expert? What did he or she say? Bartholomew Smith and Byron Anderson with SEI. Bartholomew Smith signs an affidavit, contrary to what counsel says, that he only looked at the Florida Building Code. He says, I looked at both criteria in ACI 11790 and the Florida Building Code. If you think his review of the Florida Building Code standard is superfluous, he says he looks at both standards in ACI 11790, and his affidavit in the record says their expert did not. No, I don't want to hear about what their . . . I don't want to hear about your expert's criticisms of their experts. I want to know what evidence you have, affirmative evidence on your side of the case, that there was structural damage. Mr. Smith's affidavit says he found deflection in excess of 0.5 inches over 10 feet. Deflection of excess of what? In excess of 0.5 inches over 10 feet. But that's not the . . . We're talking about 1.5. What's the . . . 1.5 is the overall, and then the .5 over 10. What expert do you have who says it exceeded 1.5? That's the first standard. None of the experts found that the overall floor exceeded 1.5, but the localized unlevelness in the dining room was in excess of .5 over 10 feet. That's part two of ACI 11790 that their experts never tested. And again, I go back . . . I understand, but I go back to the burden of proof. Is 0.5 structural damage under the statute? 0.5 over 10 feet is the second standard under ACI 11790 adopted by Florida statutes. So there's two. There's two, and they tested for one. Okay. Our experts tested both. This is one of those cases where we're going to have to just dive into the record because the two parties' views of what the evidence in the record is on both sides is so diametrically opposed that it's impossible to figure out, at least from an initial surface reading of who's right and who's not. You're telling me and us that ACI 11790 has two parameters for structural damage. One is 1.5 inches or more over a what? The entire slab surface. Okay. And the other one is point what? That a 10-foot straight edge placed on two high points, a half-inch gap under the straight edge when you place a 10-foot straight edge on two high points on the floor. 0.5 or more? Correct. And ACI 11790 uses those as disjunctive, like one or the other? Either or would be a violation. And our expert found on the second one, which is Section 4.5.7 of ACI 11790, the deflection in excess of the half-inch over 10 feet. Their experts never tested for it, and I go back to the burden of proof that mandates summary judgment against federal when they failed to use one of the criteria. What you're saying is the evidence doesn't show it, but you're saying that they didn't test for it. Correct. They didn't even test for it at all. No, the evidence doesn't show it. Ours does. I hear you saying that the evidence doesn't show it, but they had the burden of proof. Correct. Well, they did have the burden of proof on all of these, but our expert does say that the tolerance was met. You're saying that not only did they not test for it, that your expert affirmatively found it was the required deviation under one of the two alternatives of ACI 11790. Correct. Their expert just argues in his deposition, I don't agree with that standard, I don't think it's reasonable to use that standard that the Florida legislature adopted, and he says in there that this 10-foot straight edge is not a tool that we use. Using that standard is a question of law, isn't it? Whether the standard should have been used creates a question of law, does it not? Absolutely. That's our brief.  And as a matter of law, they did not test one of the tolerances. Okay, Mr. Weber, thank you very much. Thank you both. Thank you. Okay, come on up. Thank you.